UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————

ROSSANA ROSADO, in her official capacity as
NEW YORK STATE SECRETARY OF STATE,
THE NEW YORK STATE DEPARTMENT OF STATE,
and the STATE OF NEW YORK,

                                        Plaintiffs,                    **COMPLAINT**

                                                                      **No. 22-cv-788**
            -against-

GINA RAIMONDO, in her official capacity as
UNITED STATES SECRETARY OF COMMERCE, THE
UNITED STATES DEPARTMENT OF COMMERCE,
RICHARD W. SPINRAD, in his official capacity as
UNDER SECRETARY OF COMMERCE FOR OCEANS
AND ATMOSPHERE & ADMINISTRATOR OF THE
NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION, and THE NATIONAL OCEANIC
AND ATMOSPHERIC ADMINISTRATION,

                                        Defendants.

———————————————————————————

        Plaintiffs Rossana Rosado, as Secretary of the New York State Department of

State (NYSDOS), the NYSDOS, and the State of New York (collectively, New York),

by their attorney Letitia James, Attorney General of the State of New York, as and

for their complaint, allege as follows, based on information and belief:

## NATURE OF THE ACTION

        1.      This case challenges a decision issued on November 16, 2020 (Decision)

by defendants the U.S. Department of Commerce and the National Oceanic and

Atmospheric Administration (NOAA) (collectively, together with Secretary of

Commerce Gina Raimondo and Under Secretary of Commerce for Oceans and

Atmosphere & NOAA Administrator Richard W. Spinrad, Commerce),[1] which overrode New York's objection to the Electric Boat Corporation's (Electric Boat) proposed disposal of nearly a million cubic yards of dredged material from Connecticut's Thames River into an area of eastern Long Island Sound never before used for such open water dumping. Commerce's actions and Decision violated lawful procedure, were arbitrary and capricious, unsupported by the record, and otherwise contrary to law.

2. Electric Boat is constructing a new class of submarines for the United States Navy at Electric Boat's Groton, Connecticut shipyard facility. To accommodate the larger size of the new class of submarines, Electric Boat plans to dredge and dispose of 890,000 cubic yards of sediment from the Thames River adjacent to its facility. In May 2018, Electric Boat applied to the U.S. Army Corps of Engineers (Army Corps) for a permit under Section 404 of the Clean Water Act and under Section 103 of the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. §§ 1344, 1413, to dispose of the dredged material in the Long Island Sound. Electric Boat's federal permit application to the Army Corps and its submissions to New York identified two preferred alternative disposal sites: a previously used disposal site in Central Long Island Sound (Central Site) and a never-before-used site in Eastern Long Island Sound (Eastern Site).

3. To lawfully dispose of the dredged material in Long Island Sound,

---

[1] The NOAA Administrator has been delegated authority by the Department of Commerce to perform functions prescribed in the Coastal Zone Management Act, including administering and deciding consistency appeals.

Electric Boat also requires a consistency concurrence from New York pursuant to the Coastal Zone Management Act (CZMA), 16 U.S.C. § 1451 *et seq.* In June 2019, Electric Boat submitted a consistency certification to New York for disposal of 890,000 cubic yards of dredged material at the Eastern Site beginning in late 2020. New York reviewed Electric Boat's disposal plan and objected to Electric Boat's coastal consistency certification as inconsistent with the enforceable policies of the State's federally-approved Coastal Management Program. In its objection, New York provided a number of feasible alternatives, including disposal at the Central Site, that would have allowed the applicant to dispose of the dredged material consistent with New York's coastal policies.

4. Rather than accept any of New York's suggested alternatives, one of which was a preferred site it had already identified in its application, Electric Boat instead appealed New York's objection to Commerce.

5. As the administrative appeal was nearing completion, the U.S. Navy, although not involved in the CZMA review of the proposed disposal activity, submitted a letter long after the comment period had closed, informing Commerce that the disposal could no longer begin in 2020, but instead had to take place between October 1, 2024 and February 1, 2025. Due to this new and unsubstantiated timeline, the Navy asserted that the project could not be completed on time and, therefore, national security objectives would not be met unless the Eastern Site was used for disposal.

6. Commerce failed to acknowledge the procedural and substantive

significance of this last-minute, material, and extra-record information. Commerce neither re-noticed the matter for public and federal agency comment, nor allowed New York to evaluate the Navy's claims. Instead, Commerce adjudicated the changed matter de-novo, contrary to the CZMA and its regulatory requirements. Relying on the Navy's conclusory and unsupported allegations, Commerce overrode New York's objection on national security grounds.

7. New York does *not* bring this action to object to the submarine construction project at the Electric Boat facility.

8. This lawsuit is necessary because Commerce, at the end of an administrative appeal proceeding, unfairly allowed material and fundamental changes to the timeline of the very activity undergoing appellate review. Commerce then relied on those changes to improperly override New York's objection on national security grounds, in violation of federal procedural requirements, without establishing support in the record, and contrary to the CZMA.

9. First, Commerce's actions illegally sidestepped regulations under 15 C.F.R. Part 930 Subpart H governing appeals of state objections to coastal consistency certifications. Commerce's acceptance of the Navy's late comments violated the regulation prohibiting acceptance of federal agency comments past closure of the comment period, without making a finding of good cause for reopening the comment period. 15 C.F.R. § 930.128(c)(2). Moreover, Commerce's reliance on the Navy's comments as the basis for overriding New York's objection violated the regulation prohibiting the Secretary from considering bases for appeal not identified in the

appellant's notice of appeal. 15 C.F.R. § 930.125. Commerce's procedural irregularities alone warrant vacatur of the Decision.

10. Second, the Decision is unsupported by the record. In changing the activity's timeline at the eleventh-hour and using that new timeline to establish a purported national security "need" to dispose at the Eastern Site, Electric Boat and the Navy made numerous unsupported assertions contradicted by the extensive appeal record. The State was not given the opportunity to verify these last-minute assertions, yet Commerce relied upon them in overriding the State's objection. In addition, Commerce selectively weighted input from the Navy, yet failed to request or consider expert input about dredging disposal by qualified federal agencies, such as the National Marine Fisheries Service and the Army Corps, that could evaluate the merits of the new assertions.

11. Third, Commerce failed to adhere to the purposes of the CZMA, and acted contrary to Commerce's own longstanding federal consistency review process. Commerce's acceptance of the Navy's material changes to the activity timeline effectively eliminated New York's proposed alternative of disposal at the Central Site. Thus, Commerce's actions deprived New York of its right to propose reasonable, available disposal alternatives to an activity that it found inconsistent with New York's coastal policies. *See* 15 C.F.R. § 930.63. The changed and delayed timeline warranted State review under the CZMA because it affects the available alternatives to be considered and evaluated by the State. By allowing the material change to the disposal activity timeline during the disposal proponent's administrative appeal,

5

Commerce improperly compromised New York's rights under the CZMA and undermined the very purpose of coastal consistency review.

12.     For all of these reasons, the Decision should be declared unlawful and vacated.

## JURISDICTION AND VENUE

13.     Because the claims for relief in this complaint arise under the laws of the United States, including the Coastal Zone Management Act, 16 U.S.C. §§ 1451-1467, and the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706, this Court has jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 5 U.S.C. §§ 701-706.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because one or more of the plaintiffs reside in this district and no real property is involved in this action.

## THE PARTIES

15.     Plaintiff Rossana Rosado is the Secretary of State of New York and the administrative head of plaintiff NYSDOS, an agency of the State of New York, which is authorized to administer the New York Coastal Management Program under the CZMA.  The New York Secretary of State has the authority to determine whether proposed activities requiring a federal permit are consistent with the enforceable coastal policies of the State's Program.

16.     Plaintiff State of New York is a sovereign entity that brings this action in its proprietary capacity and as *parens patriae* on behalf of its citizens and residents

as a body politic and a sovereign entity.

17.     Defendant United States Department of Commerce is an executive department of the federal government.     Defendant National Oceanic and Atmospheric Administration (NOAA) is a federal agency within Commerce charged with implementing the Coastal Zone Management Act.

18.     Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce, and defendant Richard W. Spinrad is the Undersecretary of Commerce for Oceans and Atmosphere & Administrator of NOAA.

## STATUTORY AND REGULATORY BACKGROUND

### A.  The Administrative Procedure Act

19.     Under the Administrative Procedure Act (APA), a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.  The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13).

### B.  The Coastal Zone Management Act

20.     Under the Coastal Zone Management Act, a coastal state may submit for approval its state Coastal Management Program to the U.S. Secretary of Commerce, acting through the federal Office of Coastal Management within NOAA.

7

16 U.S.C. § 1454. Stringent requirements must be met for state program approval. *See id.* § 1455(d); 15 C.F.R. Part 923. The Commerce Department's approval of a state coastal program federally authorizes state regulation and protection of the land and water uses and natural resources in the state's coastal zone.

21. On September 30, 1982, New York's Coastal Management Program was approved by the U.S. Secretary of Commerce and became effective.

22. In 2001, the Commerce Department approved New York's Long Island Sound Regional Coastal Management Program for incorporation into New York's existing Coastal Management Program. The Long Island Sound Management Program includes specific enforceable policies reflecting the findings, needs, and public interest objectives concerning the Long Island Sound region. Federal agency activities and federally-permitted activities that may affect the uses and resources of the Long Island Sound coastal area are subject to review for consistency with the coastal policies of New York's Coastal Management Program and its Long Island Sound Management Program. 15 C.F.R. Part 930, Subparts C and D. Also incorporated into New York's Coastal Management Program in 2005 with federal approval was the local waterfront revitalization program of the Town of Southold, New York, which is located on Long Island Sound and includes much of the North Fork of Long Island and Fishers Island.

23. In 2006, the U.S. Secretary of Commerce approved the inclusion of an interstate consistency component in New York's Coastal Management Program. 15 C.F.R. Part 930, Subpart I. New York State demonstrated, and the U.S Secretary of

Commerce agreed, that the designation and use of open water disposal sites in Connecticut waters in Long Island Sound have reasonably foreseeable effects on New York's coastal resources and uses. Consequently, the New York Coastal Management program's geographical reach in Long Island Sound includes Connecticut's state waters to the -20' bathymetric mark depth (Connecticut likewise has an expanded coastal boundary for purposes of coastal program consistency review to the commensurate line in New York waters). Thus, New York has authority to conduct CZMA consistency review over proposed activities requiring a federal permit that occur in a portion of Connecticut's Long Island Sound waters, including in the instant case, the dredged material disposal activity as proposed by the permit applicant Electric Boat that requires both Clean Water Act Section 404 and Marine Protection, Research, and Sanctuaries Act Section 103 disposal permits.

24.     Once the U.S. Secretary of Commerce approves a state Coastal Management Program, the CZMA requires all applicants for a federal license or permit to conduct an activity that affects land or water use or natural resource in the coastal zone to certify that "the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program." 16 U.S.C. § 1456(c)(3)(A). This "consistency certification" must be provided by the permit applicant to the designated state coastal management agency together with all necessary information and data, including the permit application and a detailed description of the proposed activity, so that the state may provide for public notice and comment. *Id.*; 15 C.F.R. §§ 930.57, 930.58,

930.61.

25.     Under the CZMA, the state has six months to concur or object to the applicant's consistency certification.  16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. § 930.60. The responsible state agency may object to the applicant's consistency certification by "describ[ing] how the proposed activity is inconsistent with specific enforceable policies of the management program," and "may describe alternative measures (if they exist) which, if adopted by the applicant, may permit the proposed activity to be conducted in a manner consistent with the enforceable policies of the management program."  15 C.F.R. § 930.63(b).  Upon receipt of the state agency's objection to a consistency certification, under 15 C.F.R. § 930.64 the federal permitting agency may not issue a permit to the applicant unless the state's objection is overridden by the Secretary of Commerce on an appeal by the applicant.

## C.  Commerce Regulations Governing Appeals of State Objections to Consistency Certifications

26.     The state's objection to a consistency certification may be appealed by the permit applicant to the U.S. Secretary of Commerce.  15 C.F.R. Part 930, Subpart H; 16 U.S.C. § 1456(c)(3)(A).  The Commerce Secretary may sustain the appeal upon finding that the proposed  activity is either consistent with the CZMA's objectives or purposes or is necessary in the interest of national security.  *Id.*; 15 C.F.R. § 930.120.

27.     To be "consistent with the objectives or purposes" of the CZMA means that the proposed permit activity must satisfy each of three requirements: "(a) [t]he activity furthers the national interest as articulated in [the CZMA], in a significant or substantial manner, (b) [t]he national interest furthered by the activity outweighs

its adverse coastal effects, when those effects are considered separately or cumulatively, and (c) [t]here is no reasonable alternative available which would permit the activity to be conducted in a manner consistent with the enforceable policies of the management program." 15 C.F.R. § 930.121.

28.     "Necessary in the interest of national security" means "a national defense or other national security interest would be significantly impaired were the [federal permit] activity not permitted to go forward as proposed." 15 C.F.R. § 930.122. Under the CZMA, "[a]ll reasonable efforts should be made by the [Commerce] Secretary to reconcile national security needs and the State management program in the case of [] conflicts." S. Rep. No. 92-753, 92nd Cong., 2d Sess. (1972), Legislative History of the Coastal Zone Management Act of 1972, at 210-211.

29.     The CZMA regulations at 15 C.F.R. § 930.125(b) direct that "[b]ases for appeal (including procedural arguments) not identified in the appellant's notice of appeal *shall not be considered by the Secretary*." (emphasis added).

30.     The CZMA regulations at 15 C.F.R. § 930.128(c)(1) state that "[t]he Secretary shall accord greater weight to those Federal agencies whose comments are within the subject areas of their technical expertise."

31.     The CZMA regulations at 15 C.F.R. § 930.128(c)(2) provide that "[t]he Secretary may, on the Secretary's own initiative or upon written request, for good cause shown, reopen the period for federal agency comments before the closure of the decision record."

# FACTUAL ALLEGATIONS

## A. Long Island Sound and Dredged Material Disposal Sites

32.    Long Island Sound is a semi-enclosed, tidal estuary bounded by New York, Connecticut, and Rhode Island.  At 110 miles long and up to 20 miles wide, the Sound is one of the largest estuaries along the Atlantic coast of the United States. The New York - Connecticut boundary runs the length of the Sound through its approximate center until reaching the waters of Rhode Island.  The estuary connects to the Atlantic Ocean at its eastern end through the Race and Block Island Sound, and to New York Harbor at its western end through the East River at Throgs Neck and the New York City municipal boundary.

33.    Estuaries are places where ocean saltwater mixes with freshwater from rivers and streams, providing vital nesting and breeding habitat for many aquatic and benthic species.  Long Island Sound has been one of the most productive estuaries in the United States.  While commercial fishing has significantly declined, the Sound remains a critical marine resource to New York and neighboring states.  In 1988, the U.S. Environmental Protection Agency (EPA) designated Long Island Sound as an Estuary of National Significance.  *See* 33 U.S.C. § 1330.

34.    Disposing dredged materials in an estuary can present a significant risk of environmental harm.  Materials dredged from in and around rivers and harbors adjoining sites of historic or current commercial or industrial operations often contain toxic substances injurious to the marine environment, fauna, and humans. Additionally, vessels hauling and discharging such dredged materials must be safely

12

integrated with the flow of other commercial and recreational vessels to avoid accidents.

35.    In order to manage these risks, disposals subject to the Marine Protection, Research, and Sanctuaries Act, commonly known as the Ocean Dumping Act, and disposals subject to the Clean Water Act, are allowed only pursuant to permit(s) issued by the Army Corps.

36.    In July 2016, EPA published a final rule designating two permanent dredged material disposal sites in Long Island Sound—the Central Long Island Disposal Site (Central Site) and the Western Long Island Disposal Site (Western Site). Then, in December 2016, EPA published a final rule to designate another permanent dredged material disposal site in eastern Long Island Sound—the Eastern Long Island Sound Disposal Site (Eastern Site).

37.    New York filed a lawsuit against EPA in August 2017, challenging the designation of the Eastern Site on several grounds, including that under the CZMA the designation was not consistent with New York's Coastal Management Program, specifically the applicable coastal policies of the federally-approved NYS Long Island Sound Coastal Management Program and the Town of Southold Local Waterfront Revitalization Program. *Rosado, et al. and Town of Southold, et al. v. Wheeler, et al. and Connecticut Dept. of Energy & Environ. Protection*, U.S. District Court, Eastern District of New York, Case No. 17-cv-04843.

38.    In that case, the U.S. District Court for the Eastern District of New York granted summary judgment to EPA in a Memorandum and Order dated July 17,

2020.  The State appealed the order and that appeal is pending.  *Town of Southold and Rosado, et al. v. Wheeler*, U.S. Court of Appeals for the Second Circuit, Case No. 20-3189.  In the meantime, no dumping of any dredged material has occurred at the Eastern Site.

### B. Electric Boat's Proposal to Dispose of Dredged Material in Long Island Sound

39.     Electric Boat was commissioned by the Navy to construct a new class of ballistic missile submarines, the COLUMBIA class, to replace the OHIO class submarines, which will begin to reach the end of their service lives in 2027.

40.     In connection with this project, Electric Boat developed a South Yard Facilities Master Plan to upgrade the infrastructure at its shipyard facility on the eastern bank of the Thames River in Groton, Connecticut.  The Master Plan calls for Electric Boat to dredge in the Thames River adjacent to its facility in order to provide new in-water infrastructure accommodating the larger-sized COLUMBIA class submarines.  To undertake the project, Electric Boat sought permit approvals from the Army Corps.

41.     The Army Corps applied a two-phase approach for permitting the Electric Boat South Yard project.  A Phase I permit would govern project work not involving disposal of dredged material in Long Island Sound, and a Phase II permit would govern the remaining dredging and disposal.  The disposal of dredged material in the open waters of Long Island Sound would require the New York Department of State's CZMA consistency concurrence.

42.     The Army Corps gave Phase I permit approval to Electric Boat on July

11, 2019.  New York did not review the Phase I Army Corps permit for federal consistency because that project work would occur outside New York's coastal zone and New York's interstate federal consistency review boundary in Long Island Sound.

43.     As to the project's Phase II, in May 2018 Electric Boat submitted a joint application to Connecticut for a Clean Water Act Section 401 water quality certification, and to the Army Corps for the following permits: Rivers and Harbors Act, Section 10; Clean Water Act, Section 404, 33 U.S.C. § 1344; and Marine, Protection, Research, and Sanctuaries Act, Section 103, 33 U.S.C. § 1433.  In its application, Electric Boat sought permission to dispose 890,000 cubic yards of dredged material from the Thames River adjacent to Electric Boat's facility.  Electric Boat's permit application stated that the offshore disposal of these dredged materials would occur between Fall 2021 and Spring 2026.  Electric Boat's permit application identified two disposal sites in Long Island Sound: the previously used Central Site and the never-before-used Eastern Site, both of which are located within New York's interstate consistency boundary in Long Island Sound.  In its permit application, Electric Boat evaluated the Central Site as the available alternative for disposal of the 890,000 cubic yards of dredged material.

44.     The Biological Assessment (BA) attached to Electric Boat's permit application to the Army Corps stated: "Available open water disposal sites within a reasonable hauling distance include the Eastern Long Island Sound dredge disposal site (ELDS) and the Central Long Island Sound dredge disposal site (CLDS), located approximately 7 and 43 miles, respectively, from the [Electric Boat] Groton facility."

The BA continued: "It is assumed for the purpose of this BA that disposal will occur at the CLDS and is consistent with NMFS [National Marine Fisheries Service] expectations for the proposed dredging. It is expected that dredge disposal vessels could make approximately one to two round trips per day between the dredge site and the disposal site."

45.     On June 27, 2019, Electric Boat submitted a CZMA consistency certification to the New York Department of State for its proposed activity to dispose of 890,000 cubic yards of dredged material at the Eastern Site. While Electric Boat had initially identified both the Central Site and the Eastern Site as feasible and available disposal site options in its permit application to the Army Corps, in its consistency certification to New York it identified only the Eastern Site for disposal. Electric Boat's consistency certification noted that disposal at the Eastern Site would "start[] in late 2020."

### C. New York's Review and Objection to Electric Boat's CZMA Consistency Certification

46.     Following its in-depth review, the New York Department of State determined that Electric Boat's proposal to use the Eastern Site for disposal would have adverse coastal effects, rendering it inconsistent with enforceable coastal policies 5, 6, 8, 10 and 11 of the Long Island Sound Coastal Management Program and enforceable coastal policies 5, 6, 8, 10 and 11 of the Town of Southold Local Waterfront Revitalization Program. These policies serve to protect and improve water quality; protect and restore ecosystems; minimize environmental degradation and control pollution; protect and provide sufficient infrastructure for water

16

dependent uses; and promote sustainable use and health of living marine resources.

47.     New York issued its objection to Electric Boat's consistency certification on December 27, 2019, detailing the reasons for New York's objection and providing a list of available and feasible alternatives for Electric Boat to consider.  New York specifically disagreed with Electric Boat's assertion in its certification that open water disposal at the Eastern Site is in the interest of national security and that it is the only disposal site that would allow activity to proceed as proposed.

48.     In its objection, New York first explained that Electric Boat had relied upon a number of legally and factually incorrect statements to justify disposal of 890,000 cubic yards of dredged material at the Eastern Site.  In particular, Electric Boat incorrectly: (1) stated that open water disposal is in the interest of national security, and disregarded the consequent harm to the environmental and economic interests of New York; (2) relied solely on cost to justify selection of the Eastern Site; and (3) stated that there are no reasonable alternatives to open water disposal at the Eastern Site.

49.     New York included detailed explanations of how Electric Boat's proposed disposal activity is not consistent with five of New York's thirteen Long Island Sound coastal policies.  The activity is inconsistent with New York Policy 5, designed to protect and improve water quality in Long Island Sound, because it could cause elevated suspended solids and turbidity outside of the Eastern Site boundaries and within New York State waters, which could detrimentally impact New York's water quality.  Discharged sediment is a pollutant that limits light and oxygen in the

receiving water column and thereby imposes stress on the pelagic ecosystem. Disposal at the Eastern Site will also introduce the chemical contaminants in the dredged materials into the benthic habitat and the water column.

50.     The disposal activity is inconsistent with New York Policy 6, which seeks to protect and restore Long Island Sound's ecosystem, because it will stress the estuarine system.  In particular, potential adverse impacts of the activity include: water quality impacts (turbidity and toxicity) during the disposal process; permanent alteration of the bottom substrate through deposition of material; loss of bottom dwelling organisms through burial and suffocation; and resuspension, transport, and redeposition of contaminants during disposal.

51.     New York found that the disposal activity is inconsistent with New York Policy 8, designed to minimize environmental degradation and control pollution in Long Island Sound.  New York found that because the dredged material contains a range of contaminants, including arsenic, nickel, mercury, zinc, and polychlorinated biphenyls (PCBs), it will adversely affect the coastal resources in the Eastern Site benthic habitats, and could affect other areas due to the strong currents dispersing the dredged material to other areas in the Sound.

52.     New York further determined that the disposal activity is inconsistent with New York Policy 10, intended to protect and provide sufficient infrastructure for water dependent uses in Long Island Sound.  The Eastern Site is located in one of the busiest recreational and ferry traffic areas in the Sound, and New York concluded that the activity presents risk of interference with the safety, logistics, and flow of

important interstate ferry traffic between New York and New England via the Cross Sound Ferry.

53.     Finally, New York found that the disposal activity is inconsistent with New York Policy 11, which promotes the sustainable use and health of living marine resources in Long Island Sound, because it would alter physical habitats and species colonization and may result in lower biodiversity and lengthy species re-colonization periods.  Use of the Eastern Site for dredge spoil disposal will also cause restrictions on shellfish harvesting in the area, affecting commercial and recreational New York fishers.  Because climate change is already causing stress to the marine resources of Long Island Sound, the expansion of ocean dumping there should be avoided.

54.     Notwithstanding its objection to Electric Boat's certification, New York identified several alternatives to the proposed activity which, if selected by Electric Boat, would be consistent with the coastal policies of New York.  New York explained that "[r]easonable and practicable alternatives exist that are less harmful to the environment than open water disposal in eastern Long Island Sound and would allow the project to move forward" and stated, pursuant to 15 C.F.R. §930.121(c), that these alternatives "would permit the activity to be conducted in a manner consistent with the enforceable policies of the management program." 15 C.F.R. § 930.121(c).  In particular, New York identified the alternative of disposal at the Central Site, which Electric Boat itself had listed as an alternative in its June 24, 2019 Dredged Material Management Plan and in its permit application to the Army Corps.

55.     Rather than select one of the alternatives provided by New York, two of

19

which would have allowed Electric Boat to immediately proceed with its activity as proposed, Electric Boat appealed.

### D. **Electric Boat's Appeal of New York's Objection to Electric Boat's CZMA Consistency Certification**

56.    On January 24, 2020, Electric Boat submitted a Notice of Appeal to Commerce, appealing New York's objection to its Electric Boat CZMA consistency certification on two grounds.  First, Electric Boat argued that the activity is necessary in the interest of national security pursuant to 16 U.S.C. § 1456(c)(3)(A) and 15 C.F.R. § 930.122.  "Necessary in the interest of national security" means "a national defense or other national security interest would be significantly impaired were the [federal permit] activity not permitted to go forward as proposed."  15 C.F.R. § 930.122. Second, Electric Boat argued that the activity is consistent with the objectives and purposes of the CZMA pursuant to 16 U.S.C. § 1456(c)(3)(A) and 15 C.F.R. § 930.121. "Consistent with the objectives or purposes" of the CZMA means that the proposed permit activity significantly furthers the national interest, the national interest furthered by the activity outweighs its adverse coastal effects, and there is no reasonable alternative available which would permit the activity to be conducted in a manner consistent with the State management program.  15 C.F.R. § 930.121.

57.    Electric Boat identified cost, air emissions, and navigational risks pertaining to the use of the Central Site as the bases for its rejection of that site as a reasonable and available alternative, even though Electric Boat had identified the Central Site as being both reasonable and available in Electric Boat's Dredged Materials Management Plan and in its permit application to the Corps.  Significantly,

Electric Boat's Notice of Appeal did not identify an altered project timeline as a basis for rejecting the Central Site. Instead, it reaffirmed that disposal would "start[] in late 2020."

58. Electric Boat submitted its principal administrative appeal brief on February 21, 2020. Electric Boat argued, in part, that disposing of dredged material at the Eastern Site is in the interest of national security because it purportedly is "critical to the COLUMBIA program." Electric Boat further noted that the program is "extremely time-sensitive," but did not set forth a specific timeline under which the dredging must occur.

59. On February 24, 2020, Commerce published public notice of Electric Boat's appeal in the Federal Register, as well as New York's Newsday, and Connecticut's The Day. The notice directed that comments on the appeal from the general public and federal agencies be submitted by March 25, 2020. 85 Fed. Reg. 10421, 10422. Commerce also sent letters soliciting comments to the Army Corps, EPA, Department of Defense, Department of Homeland Security, National Security Council, Department of Justice, Department of Interior, Department of State, U.S. Fish and Wildlife Service, and the National Marine Fisheries Service.

60. On or before March 24, 2020, EPA asked for an extension of time to submit comments on Electric Boat's appeal. Pursuant to 15 C.F.R. § 930.128(c)(2), "[t]he Secretary may, on the Secretary's own initiative or upon written request, for good cause shown, reopen the period for federal agency comments before the closure of the decision record." Commerce determined in writing, on March 24, 2020, there

was good cause to grant a two-week extension and extended the comment period to April 8, 2020.

61.     New York submitted its principal appeal brief on April 21, 2020.  New York explained that the disposal activity did not meet the elements set forth in 15 C.F.R. § 930.121 that require an appellant to show that the proposed activity furthers the national interest in a significant or substantial manner, that the national interest furthered by the activity outweighs the activity's adverse coastal effects when such effects are considered separately or cumulatively, and that there is no reasonable alternative available which would permit the activity to be conducted in a manner consistent with the enforceable policies of the management program.

62.     New York also described how the reasonable alternatives identified in New York's objection, and in Electric Boat's own consistency certification and permit application to the Army Corps, would allow the activity to proceed as proposed because less environmentally damaging alternatives exist that would be consistent with State coastal policies and would allow Electric Boat to complete the COLUMBIA project within Electric Boat's stated timetable and within a reasonable budget.  New York maintained that Electric Boat could not dismiss all the enumerated alternatives based on generalized assertions of increased cost savings or inconvenience, especially when its own prior submission identified one of them—disposal at the Central Site— as available and reasonable.

63.     Electric Boat submitted its reply brief on May 11, 2020.  Electric Boat argued that it is not required to balance national security interests against the

proposed activity's coastal effects or any other factors, including the availability of alternatives.

64.     Despite the substantive briefing of the appeal, on May 14, 2020 the Navy provided an untimely comment letter, thirty-six days after Commerce's extended comment deadline of April 8, 2020.  Notably, Commerce did not issue a finding of good cause for reopening the period for federal agency comments to include such a letter in the record, as required by 15 C.F.R. § 930.128(c)(2).

65.     In its May 14, 2020 comment letter, the Navy stated: "Preliminary construction of the lead COLUMBIA Class submarine began at Electric Boat's facility in Quonset Point in 2017, while final assembly and trials of the submarines will be performed in a newly constructed assembly facility at Electric Boat's shipyard in Groton, CT, beginning in 2024.  Construction of the facility at Electric Boat's Groton shipyard, including the dredging and dredged material disposal that is the subject of this appeal, must be completed on time in order to assemble and launch the COLUMBIA Class submarines on schedule."  The Navy provided no schedule or timeframe for dredging.  Nor did the Navy identify any changes to the 2020/2021 disposal start date as proposed by Electric Boat in its federal consistency certification to New York, in Electric Boat's permit application to the Army Corps, and as presented in Electric Boat's Notice of Appeal.  Most significantly, the Navy did not indicate that the activity timeline established by Electric Boat would lead to any national security interest being significantly impaired.

66.     On May 19, 2020, in response to a request from New York, Commerce

issued an order granting each of the parties an opportunity to file additional briefs to respond to arguments previously submitted and any additional comments or documentation submitted by federal agencies, states, or the public during the extended comment period.

67.     In its first response brief, filed on June 10, 2020, New York maintained that a national security override of its consistency objection was not supported by "a general statement of a scheduling conflict or increased costs without more specific information."  New York explained that the Navy's May 14th letter only provided general comments without any specificity as to how national security would be harmed if an alternative disposal site was used.  New York further noted that: "Electric Boat has set forth a dredging and disposal schedule to occur between fall 2021 and 2024—a total of four dredging seasons—and use of any of the identified alternatives can occur in that timeframe."

68.     In its supplemental brief, filed on June 10, 2020, Electric Boat repeated the Navy's unsupported assertion that if Electric Boat is not allowed to proceed with its disposal activity as proposed, "the COLMUBIA program will be negatively impacted by a delayed construction schedule and an increase in costs."  In its brief, Electric Boat also misstated the CZMA's applicable standard for appeals of state consistency certification objections, incorrectly asserting that "the analysis ends when a project is shown to be necessary in the interest of national security."

69.     On July 17, 2020 the Navy submitted to Commerce a second untimely comment letter concerning Electric Boat's appeal.  This comment letter was provided

114 days past the March 25, 2020 closing of the comment period and 100 days beyond the extended deadline granted at EPA's request. As with the Navy's first comment letter, Commerce did not issue a finding of good cause for reopening the period for federal agency comments to receive such a letter, as required by 15 C.F.R. § 930.128(c)(2).

70. The Navy's second comment letter asserted, for the first time, that dredging and disposal could not begin until late 2024: "The window to complete the dredging in support of construction and delivery at Electric Boat is finite and limited to a single dredging period from October 1st, 2024 to February 1st, 2025, which is a total of 123 days (117 days not counting federal holidays)." The Navy opined that disposal at the Eastern Site will take 55 days, while disposal at the Central Site will take 137 days, with an additional four months to obtain necessary project permits. Based on this unsupported assertion, the Navy concluded that "the use of any other site other than [the Eastern Site] will not allow the dredging effort to be completed in the available dredging window, directly resulting in a delay to the required delivery of the first COLUMBIA Class submarine."

71. The Navy's untimely July 17, 2020 second letter contained new information that contradicted previous record evidence and was materially different from anything previously submitted by the appellant Electric Boat or by the Navy.

72. In its second untimely comment letter, the Navy stated for the first time that two newly identified sequential activities ongoing through August 2024 at the South Yard Facility in the Thames River would prevent Electric Boat from beginning

to dredge any sooner than October 2024.  The Navy stated that one activity, to be completed in late 2022, is "a new over-water Final Assembly and Test facility for the COLUMBIA Class adjacent to the dredging location."  The second activity discussed was the Navy's removal/relocation of "an underwater range facility adjacent to the [Electric Boat] dredging location.  This activity does not complete until August 2024."  While the Navy asserted that the first activity "must happen mostly in series with the second conflicting activity," no further information or explanations were provided, including why these two activities must be completed before dredging can commence.

73.     Significantly, none of the new information in the second Navy comment letter had been previously submitted to New York during its June-December 2019 coastal consistency review.

74.     Commerce did not find that the Navy's letters were untimely or outside the scope of Commerce's consideration of the appeal.  Instead, Commerce simply allowed the parties to respond to the Navy's second letter in additional briefs.

75.     In a Federal Register notice published on August 3, 2020, Commerce stayed closure of the record until August 31, 2020 to "solicit supplemental briefs from the Appellant and New York State Department of State pertaining to additional information including a July 17, 2020 comment letter received from the Department of the Navy."  85 Fed. Reg. 46,598.

76.     Although the parties were provided the opportunity by Commerce to submit additional supporting material with their briefs, Electric Boat did not submit any additional information supplementing the record to support the material changes

to the activity timeline described in the Navy's July 17, 2020 letter, nor to support the Navy's assertions that the disposal could not be completed within the 2024-2025 dredging season unless the Eastern Site is used for disposal of the dredged material. Instead, Electric Boat merely adopted the Navy's new altered activity timeline and disposal calculations as its own.

77.    New York's supplemental brief, filed on August 5, 2020, took issue with the Navy's July 17th letter as both untimely and because it introduced significant new information during an ongoing appeal—information that materially changed the timeline of the activity under review that was not presented to New York during its 2019 consistency review. New York objected to the agency's consideration of this new information as not properly before Commerce on Electric Boat's appeal. New York further maintained that if it had been provided the information prior to completion of the consistency review period, the State would have further investigated and requested additional information necessary to evaluate the Navy's claim that disposal could not be completed at the Central Site within the 2024-2025 dredging period. Such additional information would have included information concerning the Navy's unsupported assertion that disposal at the Eastern Site would take 55 days, while disposal at the Central Site would take 137 days. New York demonstrated that EB's own record submissions, as presented to the Army Corps and New York in support of EB's disposal permit, conflicted with the disposal rate calculations contained in the Navy's July 17, 2020 letter and further demonstrated that the Navy's analysis, which was based upon a materially different disposal rate for the Central Site (6,500 cubic

yards per day) versus that for the Eastern Site (16,000 cubic yards per day), lacked any record support or explanation by the Navy. In support of its argument, New York also submitted a dredging manual published by the Army Corps, and additional new materials in support of New York's arguments, that contradicted the new disposal rate relied on by the Navy and Electric Boat to support their assertion that use of the Eastern Site was necessary to address national security concerns.

78. Contrary to the Navy's assertion that the dredging and disposal season in Groton, Connecticut is only from October 1st through January 31st, New York explained that the dredging and disposal season may extend through April each year in coordination with the National Marine Fisheries Service. In addition, New York noted that the Clean Water Act Section 401 certification issued to Electric Boat allows for in-water activities to occur between September 30th and June 1st.

79. New York also pointed out that the Navy's concern regarding any alleged four-month permitting delay is unfounded because there is no reason why Electric Boat could not apply now for a permit to dispose at the Central Site, which would be four years in advance of the purported new 2024-2025 dredging and disposal season.

80. New York further noted that the comments submitted by the Navy regarding dredging and disposal methods and seasonal availability were outside the Navy's area of expertise and required independent review by Commerce.

81. Along with its brief, New York supplemented the appeal record with responsive, factual information demonstrating the inaccuracy of the Navy's and

Electric Boat's last-minute, revised disposal calculations and shortened dredging disposal season windows.

82. Commerce closed the appeal decision record on August 31, 2020 and published notice of the closure in the Federal Register the next day. 85 Fed. Reg. 54,355 (Sept. 1, 2020).

### E. **Commerce's November 16, 2020 Decision**

83. On November 16, 2020, Commerce issued the Decision, which overrode New York's objection to Electric Boat's coastal consistency certification for dredged material disposal at the Eastern Site.

84. Commerce's Decision found that New York's consistency objection had identified specific, Commerce-approved enforceable policies of New York's Coastal Management Program that the State determined to be inconsistent with Electric Boat's proposed activity. Commerce further found that the State had properly exercised its discretion to describe alternatives to Electric Boat's proposed activity.

85. Nonetheless, Commerce determined that Electric Boat's disposal of dredged material at the Eastern Site was necessary in the interest of national security. Commerce's Decision relied heavily on the Navy's July 17, 2020 letter that materially changed the start date and rate of disposal for dredged material from those previously represented by Electric Boat in its federal permit application, in its coastal consistency certification, and in its appeal to Commerce. Commerce in its Decision specifically stated that it "defers to the timeline presented by the Navy in its July comment." Decision at 18.

### F.  Flaws in Commerce's Decision-Making Process

86.    As demonstrated by the appeal record, Electric Boat's proposed activity—upon which New York's consistency certification objection and proposed alternatives were based, and which was the subject of Electric Boat's appeal—was for a dredging and disposal period commencing in late 2020.  Commerce's Decision, greenlighting the disposal activity on national security grounds due to a last-minute change to the activity's start date, improperly disregards regulatory requirements and fails to consider available alternatives.

87.    The substantially altered, eleventh-hour timeline proffered by the Navy on July 17th and accepted by Commerce came two months after the Navy's May 14, 2020 letter, which made no mention of the material change to the start date of Electric Boat's proposed activity.  The Navy's letter, which delayed the disposal start date by several years and altered the rate of dredged material disposal presented in Electric Boat's application, served to eliminate all of New York's proposed alternative measures.  Commerce's Decision, by accepting the Navy's changes to Electric Boat's proposed activity at the end of an appeal proceeding upon a nearly closed record, deprived New York of the opportunity to obtain information regarding the last-minute material and dramatic changes to the timing and rate of disposal.

88.    Commerce's failure to provide for proper notice and comment on these last-minute material changes also deprived the public of a proper opportunity to review and comment on them.

89.    In its Decision, Commerce misrepresented Electric Boat's Notice of

Appeal as stating that commencement of dredging would not occur until 2024. In fact, Electric Boat's Notice of Appeal stated that dredging would commence in late 2020. Pursuant to 15 C.F.R. § 930.125(b), "[b]ases for appeal (including procedural arguments) not identified in the appellant's notice of appeal shall not be considered by the Secretary." Commerce's consideration and reliance in its Decision on the last-minute change to the activity's start date as the basis for sustaining Electric Boat's appeal violated 15 C.F.R. § 930.125(b) by improperly considering and relying upon bases *not* identified in Electric Boat's Notice of Appeal.

90.     In its Decision, Commerce determined that it need not conduct any alternatives analysis because its Decision was based on national security. That determination is contrary to Congress' directive when enacting the CZMA that Commerce reconcile conflicts presented by proposed activities involving competing national security and State management program needs. Commerce's Decision improperly disregards Congress' directive to Commerce that "[a]ll reasonable efforts should be made by the Secretary to reconcile national security needs and the State management program in the case of [] conflicts." S. Rep. No. 92-753, 92nd Cong., 2d Sess. (1972), Legislative History of the Coastal Zone Management Act of 1972, at 210-11. Here, no such effort was made. Commerce's Decision also contravenes prior Commerce Department decisions that relied upon this Congressional directive by examining alternatives to determine if a proposal can proceed in a different form while reconciling such conflicts. Contrary to Congressional directive, Commerce in its Decision simply dismissed consideration of *any* alternative proposals proffered by

the State agency for reconciling potential conflicts between national security and state coastal management programs.

91.    In addition, by accepting the Navy's comments months past closure of the comment period without making a finding of good cause for reopening the comment period, Commerce violated its own regulations at 15 C.F.R. § 930.128(c)(2). And by affording great weight to the Navy's comments regarding dredged material disposal, a subject area *not* within the Navy's area of expertise, Commerce disregarded its own regulations at 15 C.F.R. § 930.128(c)(1).

## FIRST CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act's Requirement to Observe Legally Required Procedures

92.    New York incorporates by reference in this claim the allegations contained in all preceding paragraphs of the Complaint as if fully set forth herein.

93.    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

94.    Under the CZMA, the predicate of a state coastal consistency objection is a discrete proposed activity requiring a federal permit.  Appeals of state coastal consistency objections require public notice and comment, and proper consideration of such appeals by the Secretary of Commerce requires that the subject of the appeal not materially change during, let alone at the end of, appeal proceedings.

95.    By determining to override a state coastal consistency objection and authorizing federal permit issuance for an activity materially different from the

activity proposed by the appellant permit applicant, Commerce's Decision is contrary to the CZMA's statutory and regulatory requirements and must be set aside.

96. By accepting federal agency comments past closure of the comment period, without making a finding of good cause for reopening the comment period, Commerce violated its own regulation. *See* 15 C.F.R. § 930.128(c)(2). Commerce then impermissibly considered and improperly relied upon this material, which asserted bases not identified in appellant's own Notice of Appeal, to override New York's consistency objection. *See* 15 C.F.R. § 930.125(b).

97. By authorizing federal permit issuance for an activity with a timeline that was materially different than that proposed by the permit applicant, and by failing to provide for notice and comment on new last-minute, third-party information that materially altered the matter on appeal and formed the basis for Commerce's determination, Commerce's Decision is without observance of lawful procedure and must be set aside.

## SECOND CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act's Prohibition Against Arbitrary and Capricious Action

98. New York incorporates by reference in this claim the allegations contained in all preceding paragraphs of the Complaint as if fully set forth herein.

99. The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2)(A).

100. Agency action is arbitrary, capricious and not in accordance with law

where the agency offers an explanation for its action that runs counter to the evidence before the agency.

101.    By basing its override of the State's objection on information materially contradicted by the record evidence, including contradictory evidence provided by the appellant permit applicant whose proposed activity is the very subject of the appeal, Commerce's Decision is arbitrary, capricious, not in accordance with law, and must be set aside.

102.    Because Commerce's determination to override the State's objection relies on unsupported information provided by a federal agency on a topic outside that federal agency's area of expertise, Commerce's Decision is arbitrary, capricious, not in accordance with law, and must be set aside.

### THIRD CLAIM FOR RELIEF

**Violation of Administrative Procedure Act's
Prohibition Against Acting in Excess of Statutory Authority**

103.    New York incorporates by reference in this claim the allegations contained in all preceding paragraphs of the Complaint as if fully set forth herein.

104.    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

105.    An agency action violates the APA where the action is contrary to statutory or regulatory requirements.

106.    By failing to conform their determination to the CZMA and its

34

regulatory requirements governing appeals of state objections to coastal consistency certifications, Commerce's Decision is in excess of statutory authority and must be set aside.

## **PRAYER FOR RELIEF**

**WHEREFORE**, New York respectfully requests that this Court issue a judgment and order:

1) declaring that Commerce's November 16, 2020 Decision is without observance of procedure required by law, arbitrary, capricious, not in accordance with law, and in excess of statutory authority;

2) declaring Commerce's November 16, 2020 Decision unlawful, setting it aside, and vacating it;

3) awarding Plaintiffs their reasonable fees, costs, expenses and disbursements, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

4) awarding Plaintiffs such additional and further relief as the Court may deem just, proper and necessary.

Dated: New York, New York
February 11, 2022

LETITIA JAMES
Attorney General of the
State of New York
Attorney for Plaintiffs

By: _/s/ Laura Mirman-Heslin_

Laura Mirman-Heslin
Timothy Hoffman
Assistant Attorneys General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
Laura.Mirman-Heslin@ag.ny.gov
Timothy.Hoffman@ag.ny.gov